1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DAVID RIKER, *et al.*,

                  Plaintiff,

vs.

JAMES GIBBONS, *et al.*,

                Defendants.

Case No.  3:08-cv-00115-LRH-VPC

## <u>Appendix A</u>

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DAVID RIKER, *et al.*,   -

          Plaintiff,

vs.

JAMES GIBBONS, *et al.*,

          Defendants.

Case No.  3:08-cv-00115-LRH-VPC

## SETTLEMENT AGREEMENT

I.     **INTRODUCTION**

    A.    **THE PARTIES**: THIS SETTLEMENT AGREEMENT (hereinafter referred to as the "AGREEMENT") is made and entered into as of the date this AGREEMENT is signed, by, among, or on behalf of:

    1.    **DEFENDANTS/STATE OF NEVADA**: JAMES GIBBONS, Governor of Nevada, ROSS MILLER, Secretary of State of Nevada, CATHERINE CORTEZ MASTO, Attorney General of Nevada, HOWARD SKOLNIK, Director, Nevada Department of Corrections ("NDOC"), ROBERT BANNISTER, Medical Director, NDOC, and E.K. MCDANIEL, Warden, Ely State Prison ("ESP") in Ely, Nevada, on behalf of the NDOC, and all of its officers, directors, employees, former-employees, agents, predecessors, boards, panels, divisions, successors, administrators, and assigns, acting privately, individually, or under color of authority at, or for the benefit of, ESP or its operations, including its operations arising from or relating to the provision or delivery of medical care to inmates at ESP (hereinafter, "ESP Medical Care"), and further including any person responsible for promulgating, maintaining, enforcing any rules, directives, regulations, (hereinafter all such persons are collectively referred to as "DEFENDANTS" and the "STATE OF NEVADA"); and

    2.    **PLAINTIFFS/ESP INMATES**: prisoners confined at Ely State Prison who comprise the class of Plaintiffs in the case of *Riker et al v. Gibbons et al.*, Case No. 3:08-cv-00115-LRH-VPC, now pending in the United States District Court for the District of Nevada (hereinafter the "RIKER LITIGATION") (hereinafter, all such persons are referred to as "PLAINTIFFS" and "ESP INMATES").

**B.** **DISPUTES/LITIGATION**: This AGREEMENT addresses and resolves certain disputes ("DISPUTES"), as herein defined.  The STATE OF NEVADA denies the truthfulness of the claims of the ESP INMATES in these DISPUTES, and DEFENDANTS further deny having engaged in any culpable conduct, with respect to the ESP INMATES' claims of the DISPUTES.

**1.** Seeking to vindicate their claims in these DISPUTES, the ESP INMATES filed a federal lawsuit against DEFENDANTS, identified herein as the RIKER LITIGATION, for which an Amended Complaint ("COMPLAINT") was filed on or about April 16, 2008.  The DEFENDANTS named in the COMPLAINT of the RIKER LITIGATION are JIM GIBBONS, ROSS MILLER, CATHERINE CORTEZ MASTO, HOWARD SKOLNIK, ROBERT BANNISTER, and E.K. McDANIEL.  The COMPLAINT in the RIKER LITIGATION generally alleges that DEFENDANTS provide inadequate medical care at ESP in violation of 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments of the United States Constitution.

**2.** The DEFENDANTS/STATE OF NEVADA generally deny the claims of the COMPLAINT in the RIKER LITIGATION, and specifically deny engaging in any culpable conduct, whatsoever, as alleged by the PLAINTIFFS/ESP INMATES in the COMPLAINT.

**C.** **SETTLEMENT**

**1.** Without making any admission of liability, DEFENDANTS/STATE OF NEVADA and the PLAINTIFFS/ESP INMATES have reached a settlement ("SETTLEMENT") of their DISPUTES and all claims of the RIKER LITIGATION, as memorialized herein.

**2.** The Parties, in the interests of judicial economy and the rational use of the Parties' limited resources, agree to a resolution of this lawsuit as set forth below.

**3.** This SETTLEMENT is submitted and entered into as a settlement of all claims for declaratory and injunctive relief regarding medical care as set forth in the COMPLAINT. PLAINTIFFS are not seeking monetary damages.

**4.** This SETTLEMENT is not to be construed as an admission of liability, a consent decree, or as an adjudication on the merits of this litigation.

**5.** Except as otherwise provided herein, the DEFENDANTS shall be obligated to commence performing their obligations under this AGREEMENT upon the date of the

filing of the Court's Order dismissing the RIKER LITIGATION with prejudice.

6.       Subsequent to the dismissal of the RIKER LITIGATION with prejudice, the parties' sole remedy to enforce or interpret this AGREEMENT, or to otherwise resolve any disputes that may arise from this AGREEMENT, other than by pursuing the dispute-resolution process set forth in Section V(M) of this AGREEMENT, shall lie in an action for breach of contract seeking specific performance only (and expressly not money damages), commenced in a Nevada state court applying Nevada law, and not reinstatement of the RIKER LITIGATION in any court for any purpose.

**II.       DEFINITIONS**

A.       The "COURT" means the United States District Court to which this case is assigned.

B.       "DEFENDANTS/STATE OF NEVADA": JAMES GIBBONS, Governor of Nevada, ROSS MILLER, Secretary of State of Nevada, CATHERINE CORTEZ MASTO, Attorney General of Nevada, HOWARD SKOLNIK, Director, Nevada NDOC, ROBERT BANNISTER, Medical Director, NDOC, and E.K. MCDANIEL, Warden, ESP in Ely, Nevada, on behalf of the NDOC, and all of its officers, directors, employees, former-employees, agents, predecessors, boards, panels, divisions, successors, administrators, and assigns, acting privately, individually, or under color of authority at, or for the benefit of, ESP or its operations, including its operations arising from or relating to the provision or delivery of ESP Medical Care to inmates at ESP, and further including any person responsible for promulgating, maintaining, enforcing any rules, directives, regulations, (hereinafter all such persons are collectively referred to as "DEFENDANTS," and the "STATE OF NEVADA").

C.       "PLAINTIFFS/ESP INMATES": prisoners confined at Ely State Prison who comprise the class of Plaintiffs in the case of *Riker et al v. Gibbons et al.*, Case No. 3:08-cv-00115-LRH-VPC, now pending in the United States District Court for the District of Nevada (hereinafter the "RIKER LITIGATION") (hereinafter, all such persons are referred to as "PLAINTIFFS" and "ESP INMATES"). Pursuant to the Court's order granting class certification, the "Plaintiffs" in this action are "all prisoners who are now, or in the future will be, in the custody of the Nevada Department of Corrections at Ely State Prison in Ely, Nevada." The term "Patient" shall refer to prisoner-patients at

ESP.

      **D.**    "ESP" means the prison currently known as Ely State Prison in Ely, Nevada.

      **E.**    "NDOC" means the Nevada Department of Corrections, its subdivisions, agents, employees, and contractors.

      **F.**    The "MONITOR" refers to the neutral medical MONITOR jointly selected by the parties as described herein.

      **G.**    "INSPECTION" refers to the MONITOR's inspection of the ESP Facility, as provided for herein.

      **H.**    "COMPLAINT" refers to Plaintiffs' Amended Complaint in the RIKER LITIGATION, filed on April 16, 2008.

      **I.**    "SUBSTANTIAL COMPLIANCE" means that DEFENDANTS/STATE OF NEVADA have achieved compliance with all material requirements of each relevant provision of the AGREEMENT.   Isolated, non-systemic incidents shall not, by themselves, cause the DEFENDANTS/STATE OF NEVADA to be found to be out of SUBSTANTIAL COMPLIANCE with any relevant provision.  Moreover, temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain SUBSTANTIAL COMPLIANCE.  At the same time, intermittent compliance during a period of sustained non-compliance shall not constitute SUBSTANTIAL COMPLIANCE.  The MONITOR may consider individual Patient cases as evidence of systemic problems, however, aberrational, anecdotal reports of irregularities that are not supported by the objective, observable criteria, such as medical records and visual observations may be discounted.   DEFENDANTS/STATE OF NEVADA's obligations under the PLAN only require DEFENDANTS to be in SUBSTANTIAL COMPLIANCE, as determined by the MONITOR, as provided for herein.  The monitoring tool developed by the MONITOR as an aid to his assessment of compliance with this AGREEMENT is attached hereto as Appendix A.

      **J.**    "NDOC HEALTH STAFF" means all NDOC QUALIFIED HEALTH CARE PROFESSIONALS as well as administrative and support staff (e.g., NDOC health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

      **K.**    "QUALIFIED HEALTH CARE PROFESSIONAL" means all NDOC

1  physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and

2  others who by virtue of their education, credentials, and experience are permitted by law to evaluate

3  and care for patients (e.g., Doctors of Osteopathy (DOs), Doctors of Medicine (MDs), advanced

4  practitioners of nursing (APNs), registered nurses (RNs), licensed practical nurses (LPNs), licensed

5  vocational nurse (LVNs)).

6        **L.**    "PRACTITIONER" means all NDOC-designated Doctors of Osteopathy,

7  Doctors of Medicine, Physician Assistants (PAs) and Advanced Practitioners of Nursing (APNs) who

8  have the final authority at ESP regarding clinical issues.

9        **M.**    "MEDICATION" means any pharmaceutical drug, also referred to as medicine,

10  medication or medicament, which can be loosely defined as any chemical substance intended for use in

11  the medical diagnosis, cure, treatment, or prevention of disease, injury, ailment, or medically-diagnosed

12  condition.

13        **N.**    "CHRONIC CARE" means a treatment plan and regular clinic visits, during

14  which the NDOC HEALTH STAFF monitors the patient's progress and, when necessary, changes the

15  treatment.  This program also includes patient education for symptom management.

16        **O.**    "SICK CALL" means the evaluation and treatment of an ambulatory patient in a

17  clinical setting, either on or off-site, by a QUALIFIED HEALTH CARE PROFESSIONAL or outside

18  medical personnel.

19        **P.**    "INTRA-SYSTEM TRANSFER" means inmates being transferred from one

20  facility to another within the NDOC System, individuals returning from off-site visits, and individuals

21  brought to ESP with an already-established health record for their current incarceration from a different

22  correctional system.

23        **Q.**    "SPECIALTY CARE" means specialist-provided health care (e.g., nephrology,

24  surgery, and orthopedics).

25        **R.**    "INFIRMARY CARE" means care provided to patients in the designated ESP

26  infirmary housing unit with an illness or diagnosis that requires daily monitoring, medication and/or

27  therapy, or assistance with activities of daily living at a level needing skilled nursing intervention.

28        **S.**    "CENTRAL PHARMACY" means the NDOC's central pharmacy (currently

1  located at Casa Grande in Las Vegas, but which location may subsequently be changed to a different

2  location), at which pharmacy MEDICATION prescription orders for ESP Inmates are ordinarily filled

3  and dispensed and subsequently delivered to ESP.

4        **T.**    "MONITOR PAYMENT PLAN" is the exclusive plan or method by which to

5  determine the allocation of costs and payments that shall be due to the MONITOR by the parties for the

6  implementation of the PLAN.

7        **U.**    The "PLAN" means the Plan of Action pertaining to the provision of medical

8  care to inmates at ESP, in effect according to the terms of this AGREEMENT, and further defined in

9  subsection V, the PLAN section of this AGREEMENT.

10        **V.**    The "AGREEMENT" means the entirety of this settlement agreement between

11  DEFENDANTS and PLAINTIFFS.

12        **W.**    "DISPUTES" as used herein refers to all those claims and assertions made by

13  PLAINTIFFS/ESP INMATES in the case of *Riker et al v. Gibbons et al.*, Case No. 3:08-cv-00115-

14  LRH-VPC, now pending in the United States District Court for the District of Nevada, and any and all

15  claims that could have been brought, arising out of the identical factual predicate set forth in said

16  lawsuit for equitable and/or injunctive relief.

17        **X.**    "EFFECTIVE DATE" as used herein refers to the date on which the Court

18  finally approves this AGREEMENT, after the execution of this AGREEMENT and notice to all parties,

19  and enters an Order Dismissing the RIKER LITIGATION With Prejudice.

20        **Y.**    "EFFECTIVE PERIOD" as used herein refers to the period during which this

21  AGREEMENT is in effect, which period begins on the EFFECTIVE DATE and ends two years after

22  the EFFECTIVE DATE, unless the parties extend the AGREEMENT according to the procedures set

23  forth herein in Section V(M).

24  **III.**     **SCOPE OF AGREEMENT**

25        **A.**    This AGREEMENT resolves all DISPUTES, herein defined, arising between the

26  DEFENDANTS and the PLAINTIFFS in the RIKER LITIGATION.

27        **B.**    The DEFENDANTS and the PLAINTIFFS stipulate that nothing in this

28  AGREEMENT shall constitute an admission or evidence of culpability, wrong-doing, error, omission,

or liability for any purpose whatsoever, including but not limited to suits in equity or suits for damages. This AGREEMENT may not be used as evidence of culpability, wrong-doing, error, omission, or liability in any proceeding, legal or otherwise, including proceedings before any court, committee, board, commission, or any administrative tribunal, including, but not limited to licensing boards or boards setting insurance rates for insureds.

    **C.**    The DEFENDANTS and the PLAINTIFFS intend that nothing in this AGREEMENT shall have any independent, preclusive effect on any:

    **1.**    damages claim commenced by an individual inmate-plaintiff tailored to the specific circumstances of that individual, separate and apart from any preclusive effect that would ordinarily result from this AGREEMENT, by operation of statutory law, including rules of civil procedure, or case law applicable to any such claims.  In this regard, this AGREEMENT does not create any rights or waive any rights that may be applicable to any such damages claim; or

    **2.**    equitable claim for injunctive or declaratory relief commenced by an individual inmate-plaintiff for claims arising after the dismissal of the RIKER LITIGATION with prejudice, tailored to the specific circumstances of the individual, separate and apart from any preclusive effect that would ordinarily result by operation of statutory law, including rules of civil procedure, or case law applicable to any such claims.  In this regard, this AGREEMENT does not create any rights or waive any rights that may be applicable to any such equitable claim for injunctive or declaratory relief.

    **D.**    Aside from any contractual rights created by this AGREEMENT, as limited by this AGREEMENT, the DEFENDANTS and the PLAINTIFFS stipulate and intend that nothing in this AGREEMENT shall create any other rights, privileges, or benefits, including any liberty or property interests arising under federal or Nevada law and the U.S. Constitution and the Nevada Constitution, to any prisoner incarcerated in the NDOC System, now or in the future.

**IV.**    **CONSIDERATION, RELEASE, AND DISCHARGE**

    The following legal consideration, release, and discharge of claims is hereby exchanged by and among the DEFENDANTS/STATE OF NEVADA and the PLAINTIFFS/ESP INMATES in support of and in execution of this AGREEMENT, to finally settle all claims, disputes, and controversies, arising

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

from and relating to the DISPUTES, COMPLAINT, and the RIKER LITIGATION, including all equitable-relief/non-money-damages claims/disputes, administrative matters, causes of actions, and controversies arising from the same, whether or not known to the PLAINTIFFS/ESP INMATES at the time of the filing of COMPLAINT, including those equitable-relief/non-money-damages claims/disputes that could have been asserted, but were not.

        **A.**     **PLAINTIFFS/ESP INMATES**: The PLAINTIFFS/ESP INMATES hereby give the following consideration, release, and discharge to DEFENDANTS/STATE OF NEVADA, in exchange for the consideration tendered by the DEFENDANTS/STATE OF NEVADA to PLAINTIFFS/ESP INMATES, described in this AGREEMENT:

        **1.**     **RELEASE AND FORBEARANCE OF CLAIMS**: PLAINTIFFS/ESP INMATES individually and on behalf of all class members, their agents, heirs, successors, and assigns hereby release and forever discharge DEFENDANTS/STATE OF NEVADA, its or their agents, officials, employees, heirs, successors, and assigns from and in connection with any and all claims, causes of action, or suits, for equitable relief of every nature whatsoever, from the beginning of time to and including the date the court enters an order dismissing the RIKER LITIGATION with prejudice, arising out of or based upon the identical factual predicate raised or asserted in PLAINTIFFS'/ESP INMATES' COMPLAINT in the RIKER LITIGATION.

        **2.**     **COMPLIANCE WITH THE PLAN**: The PLAINTIFFS/ESP INMATES hereby agree to substantially comply with their obligations, duties, burdens, and responsibilities, as outlined in the PLAN after notice and judicial approval of the AGREEMENT.

        **(a)**     **Inmates Leaving ESP After Agreement Is Signed**: The PLAINTIFFS/ESP INMATES hereby agree that the terms of this AGREEMENT will not apply to them, except for any claim-preclusive effect, if and when they leave the ESP institution, whether released on Parole or Expiration of Sentence, or whether transferred to another NDOC institution.

        **(b)**     **Inmates Arriving To ESP After Agreement Is Signed**: The PLAINTIFFS/ESP INMATES hereby agree that they will not assert any legal claim, defense, or avoidance to this AGREEMENT, that aims to or has the effect of invalidating this AGREEMENT, or any terms contained within this AGREEMENT, on the theory that such newly-admitted ESP inmates

were not part of the Class as of the effective date of this AGREEMENT.  Accordingly, such newly-admitted ESP inmates, who arrived at ESP after this AGREEMENT was signed and until the performance of the PLAN is completed, agree to be bound to all terms of this AGREEMENT.

**B.** **DEFENDANTS/STATE OF NEVADA**:  DEFENDANTS/STATE OF NEVADA hereby give to PLAINTIFFS/ESP INMATES the following legal consideration: The DEFENDANTS/STATE OF NEVADA hereby agree to substantially comply ("SUBSTANTIAL COMPLIANCE" as herein defined) with the PLAN for the period of time specified herein, according to the limitations and conditions specified herein, which period shall be at least two (2) years after the EFFECTIVE DATE of this AGREEMENT.

**V.** **THE PLAN**

**A.** **NCCHC COMPLIANCE**:  The PLAN is based, in part, on the standards set forth in the publication ("PUBLICATION") Standards for Health Services in Prisons (2008) established by the National Commission on Correctional Health Care (NCCHC).  However, it is not the intent of the parties to incorporate by reference the standards set forth in the PUBLICATION, or otherwise promulgated by NCCHC, into this AGREEMENT, or to adopt them herein, in part or whole.  Rather, all the requirements of the PLAN that may be based on NCCHC standards are expressed herein. DEFENDANTS/STATE OF NEVADA shall maintain SUBSTANTIAL COMPLIANCE with the PLAN and direct the NDOC HEALTH STAFF to comply with the PLAN.  In this regard, the parties agree that this AGREEMENT embodies or contains all the standards of the NCCHC by which to measure DEFENDANTS'/STATE OF NEVADA'S SUBSTANTIAL COMPLIANCE with the PLAN. Such SUBSTANTIAL COMPLIANCE with the PLAN will be the subject of the MONITOR's report. The PLAN recognizes that the delivery of healthcare in a correctional facility is a joint effort of custody and NDOC HEALTH STAFF.  Clinical decisions and actions regarding health care provided to patients are the sole responsibility of NDOC HEALTH STAFF.  However, the non-medical decisions needed to carry out clinical decisions are made in cooperation with custody staff.

**B.** **LIMITATION OF THE PLAN TO ESP**:  The PLAN is limited in application, force, scope, and effect to the correctional facility of ESP, not other correctional facilities, within the NDOC system.  To the degree that the PLAN has the effect of benefiting or modifying the provision of

medical care at other NDOC facilities, such other benefits or modifications do not constitute a waiver of this limitation, nor do the parties intend to be bound to any obligations arising from the AGREEMENT or the PLAN as to facilities other than ESP.  -

      **C.**    **MODIFICATIONS TO THE PLAN**:  The PLAN may not be modified in any manner, other than by express, written consent of the parties' counsel.  Failure of one party's counsel to object to any modifications that may develop in carrying out the PLAN, whether inadvertent, discovered, or undiscovered, and whether minor or major, does not constitute consent to such modifications, whether construed as course of dealings, waiver, modification, or otherwise.  Accordingly, the parties reserve their right to enforce the terms of the PLAN as originally expressed herein, or as expressly modified in writing, as herein provided.   Any such authorized, written modifications shall be clearly identified by version number, and this original PLAN is hereby designated as Version 1.0.

      **D.**    **EXPIRATION OF THE PLAN**:  The PLAN shall expire exactly two years, after the dismissal with prejudice of the RIKER LITIGATION.  In no event shall the PLAN be extended or continued beyond the two-year period, except as provided for in Section V(M).

      **E.**    **MEDICATIONS**

      **1.**    The MONITOR will evaluate and propose any necessary changes to the timely dispensing and administration of medications at ESP, including any pharmacy technician training that may be necessary, whether remedial or additional, for the QUALIFIED HEALTH CARE PROFESSIONALS who are responsible for medication dispensing and administration, as well as increased oversight and accountability mechanisms that may be necessary in the opinion of the MONITOR, for the administration and dispensing of medication at ESP.

      **2.**    In consultation with the MONITOR, DEFENDANTS/STATE OF NEVADA will set up a medication dispensing and administration system that complies with the MONITOR's recommendations, whether by pre-labeled medication-"bubble packs," medication bottles assembled by a pharmacist with all pertinent information or other medication packaging recommendations made by the MONITOR.  CENTRAL PHARMACY for routine prescriptions, or Nursing staff at ESP in an emergency situation, shall provide the Patient's name on the correct

1  medication and dispense or administer the medication, from the pack and/or bottle, subject to legal

2  requirements governing the dispensing and administration of medication.

3  **3.** Nursing Staff shall directly compare medication administration records

4  (MARs) with the Patient's name on the prescription label when preparing the medications for

5  administration to the Patients.  At the time of administering the medication to the Patient, the nurses

6  shall confirm the identification of the Patient by comparing the name of the Patient on his identification

7  card and the name obtained from the MAR.  The MONITOR shall work with DEFENDANTS to

8  develop an acceptable methodology for administering controlled substances to Patients for whom the

9  PRACTITIONER determines that standard administration techniques are not appropriate.

10  **4.** In consultation with the MONITOR and according to the PLAN,

11  DEFENDANTS/STATE OF NEVADA, through their agents and contractors, shall develop and

12  implement a system to provide medications in a timely manner, including to track and correct any

13  problems that may exist or arise with the dispensing and administration of medications at ESP.  The

14  MONITOR shall define timeliness as measured from the date the prescription is ordered by the

15  QUALIFIED HEALTH CARE PROFESSIONAL to the date it is administered, as documented on the

16  MAR or otherwise delivered to the Patient.  DEFENDANTS/STATE OF NEVADA shall develop and

17  implement written protocols designed to help ensure that there are no lapses in medication, especially

18  medications used for the treatment of chronic illnesses.  In this regard, DEFENDANTS/STATE OF

19  NEVADA intend to ensure that a Patient's prescribed medication is not interrupted by his transfer to

20  ESP from another NDOC facility.  However, to the degree that a Patient's necessary medications are

21  not forwarded with the inmate, including "keep on person" (KOP) medications,

22  DEFENDANTS/STATE OF NEVADA shall make reasonable efforts to provide stock-medication to

23  the Patient as a bridge to prevent medication-dosage discontinuity until the medications arrive at ESP.

24  When new prescriptions are written, be they for new Patients transferred in or inmates already housed

25  at the prison, they should be made available to the Patient within 1 day, either directly from the

26  CENTRAL PHARMACY or by bridging use of stock medications.  The only exception to this is when

27  a medication is ordered in an emergency situation, the medication will be provided by stock

28  medications, or in rare exceptions through a local pharmacy.  DEFENDANTS/STATE OF NEVADA

1  shall ensure that Patients refusing medication are provided counseling regarding the consequences of
2  incomplete adherence, and shall further ensure that both the refusal and the counseling is documented
3  and in-person.  When three consecutive doses are refused by the Patient, a PRACTITIONER shall be
4  notified by NDOC HEALTH STAFF.  Subsequently, the PRACTITIONER shall meet with the Patient
5  and discuss his refusal to take the medication, whereupon the medication shall be discontinued or the
6  Patient shall agree to take the medication.  DEFENDANTS/STATE OF NEVADA shall ensure that, if
7  medication is not administered to a Patient, the reason is documented and signed by the NDOC
8  HEALTH STAFF responsible for medication administration.  QUALIFIED HEALTH CARE
9  PROFESSIONALS shall be responsible for requesting refills or renewals of nurse-administered
10  medications in a timely manner.  The Patient shall be responsible for requesting refills or renewals of
11  his KOP refillable medications in a timely manner, and his failure to request refills or renewals in a
12  timely manner shall not constitute a refusal of medication for purposes of this section of the
13  AGREEMENT.   When   Patients   timely   request   a   prescribed   refill   of   medication,
14  DEFENDANTS/STATE OF NEVADA shall ensure that such medication shall be filled before the
15  Patients' prescription supply runs out.  DEFENDANTS/STATE OF NEVADA shall ensure that: (1)
16  receipt of KOP medication is documented; and (2) such documentation is signed and dated by the
17  QUALIFIED HEALTH CARE PROFESSIONAL and signed by the Patient, acknowledging receipt of
18  the medication. In consultation with the MONITOR, DEFENDANTS/STATE OF NEVADA shall
19  develop protocols for the treatment of acute pain that does not involve placement of the Patient in the
20  infirmary, including protocols for KOP medications outside the infirmary.  In consultation with the
21  MONITOR, DEFENDANT/STATE OF NEVADA shall ensure that medication is administered at a
22  medically appropriate time and in a medically appropriate manner, including dietary considerations.

23        **F.**     **<u>CHRONIC CARE</u>**

24        **1.**     The MONITOR shall evaluate the chronic disease management process,
25  and propose any necessary changes to that process, including enrollment and follow-up care at ESP,
26  and DEFENDANTS/STATE OF NEVADA shall ensure that the ESP QUALIFIED HEALTH CARE
27  PROFESSIONALS   implement   those   changes,   and   such   QUALIFIED   HEALTH   CARE
28  PROFESSIONALS shall ensure such changes are implemented.  The MONITOR shall review all

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

CHRONIC CARE clinical guidelines and policies used by ESP QUALIFIED HEALTH CARE PROFESSIONALS and ensure that they are consistent with national clinical guidelines. DEFENDANTS/STATE OF NEVADA shall make any changes to the CHRONIC CARE clinical guidelines and policies recommended by the MONITOR. DEFENDANTS/STATE OF NEVADA shall develop protocols for the treatment of chronic pain, including the safe administration of narcotics outside the infirmary and treatment of chronic or acute pain that does not involve placement of the Patient in the infirmary.

2.    In consultation with the MONITOR, DEFENDANTS/STATE OF NEVADA shall ensure that for each individual identified with a chronic illness requiring ongoing medical care, a health care treatment plan shall be developed that includes, at a minimum, the following:   a written initial evaluation containing a plan to achieve good disease control by a PRACTITIONER; regular check-ups at least once every three (3) months by a PRACTITIONER; a yearly check-up with a physician only if the Patient is in poor control of his disease and/or if determined necessary by the PRACTITIONER; and baseline and yearly laboratory work, and other diagnostics appropriate for the disease as needed.  The treatment plan's short and long range goals will be reviewed and updated at least annually in a face-to-face assessment by the PRACTITIONER or more frequently as determined by the PRACTITIONER.  Any Patient with more than one chronic disease will not require separate chronic care clinic visits for each disease, but should be treated for all diseases during his annual chronic care visit or as directed by the PRACTITIONER.

## G.    SICK CALL

1.    The MONITOR shall evaluate and propose any necessary changes in the SICK CALL process at ESP, and DEFENDANTS/STATE OF NEVADA shall ensure that the ESP QUALIFIED HEALTH CARE PROFESSIONALS implement those changes. DEFENDANTS/STATE OF NEVADA shall ensure that Licensed Practical Nurses (LPNs), Registered Nurses (RNs) and mid-level practitioners, such as Advanced Practitioners of Nursing (APNs), perform only functions within the scope of their state professional licenses and according to proper protocols, and that each QUALIFIED HEALTH CARE PROFESSIONAL is properly supervised according to the scope of his/her license. The MONITOR shall assess the sufficiency of the medical staffing to meet the medical-

staffing needs at ESP, and to make recommendations for any changes, where indicated, and DEFENDANTS/STATE OF NEVADA shall ensure that any indicated changes are implemented, except where necessary requests for budgetary authority to fund such additional staffing are not approved by the Nevada Legislature. However, where Nevada Legislative approval is required for making those changes, DEFENDANTS/STATE OF NEVADA shall make such recommendations. In no event, shall a Licensed Physician be available less than two (2) days per week, except where such staff is on vacation or other administrative leave, in which event, a licensed practitioner would be onsite and available, and a licensed physician would be "on call" as a back-up.

        **2.**    In consultation with the MONITOR, DEFENDANTS/STATE OF NEVADA shall ensure that SICK CALL will be available seven days per week to Patients in all areas of the population at ESP, including general population, segregation units or "lock-up cells," isolation units, the condemned mens' unit and special management units. DEFENDANTS/STATE OF NEVADA shall ensure that NDOC HEALTH STAFF shall collect all medical request forms ("kites") on a daily basis from each housing unit. Upon receipt of such medical "kites," but no later than twenty-four (24) hours after receipt of such medical "kites" (as measured by the date-and-time stamp marked on the "kite" received by the ESP medical department), these medical "kites" will be triaged by a Registered Nurse, or higher level practitioner according to appropriate written triage protocols. DEFENDANTS/STATE OF NEVADA shall ensure that ESP Patients have a confidential means to request medical care, regardless of the type or location of their housing unit, without having to rely solely on custody staff as an intermediary, by instituting daily rounds by a nurse to pick-up medical "kites." A Patient requesting medical care shall be seen by a Registered Nurse or higher level practitioner within 48 hours after his request has been received by health care staff. Any Patient who is seen by a nurse two consecutive times within a 30-day period for the same symptoms will be referred to a higher level practitioner without incurring an additional co-pay charge for a medical visit. This does not require two sick calls before a Patient can be referred to a higher level practitioner; a registered nurse may make such a referral after a single SICK CALL in accordance with appropriate triage protocols. Patients presenting symptoms or Patients having symptoms reported on their behalf, requiring emergency or infirmary care, shall be given timely and appropriate medical care.

**H.**   **INTRA-SYSTEM TRANSFERS AND ASSESSMENTS**:   The MONITOR will evaluate and propose appropriate changes in the medical assessments and evaluation process performed as a result of intra-system transfers into ESP, and DEFENDANTS/STATE OF NEVADA shall ensure that the ESP QUALIFIED HEALTH CARE PROFESSIONALS implement those changes. In particular, all prisoners entering ESP should be medically screened by a Registered Nurse or higher level practitioner within twelve (12) hours, but in no event shall such screening occur later than twenty-four (24) hours of arrival.   Such screening shall take place in a confidential setting and the records of HIV-positive Patients shall be labeled in such a manner as to prevent inadvertent disclosure of a Patient's HIV status.   The results of this screening shall be documented in each Patient's medical record.   The minimum components of the screening shall include, but shall not be limited to, the following:  documented inquiry into current illness, communicable diseases, current tuberculosis status, allergies, current medications, dental status, current mental health problems, suicidal ideation, chronic health problems, pending specialty appointments, signs of trauma, and a documented explanation of the procedures for access to medical services.  In addition to explaining the procedures for accessing care, ESP staff shall provide all Patients at intake with a written description of these procedures that the Patients may keep.

**I.**   **SCHEDULED OFF-SITE SERVICES**

**1.**   The MONITOR shall evaluate and propose any necessary changes in the system for referring ESP Patients for off-site medical consultations, and DEFENDANTS/STATE OF NEVADA will ensure that the ESP QUALIFIED HEALTH CARE PROFESSIONALS implement those changes.

**2.**   In consultation with the MONITOR, DEFENDANTS/STATE OF NEVADA shall ensure that Patients requiring necessary medical services that cannot be provided at ESP or within the NDOC Medical Division in a timely manner or at all, shall be provided timely access to an outside specialist for diagnostic services, medical care or consultation, according to the priority or urgency of the ordering clinician, subject to any requisite approval of the Utilization Review Panel. Where approval or other response by the Utilization Review Panel is required for specialty consultation or care, including for follow-up care, such approval or other response shall timely be documented in a

1  tracking system.  A member of the NDOC HEALTH STAFF shall be designated to track all requests

2  for specialty consultation and off-site care, the status of such requests, provision of care, and any

3  necessary-follow-up or after care ordered for ESP Patients.  DEFENDANTS/STATE OF NEVADA,

4  through their agents and contractors, shall ensure that any diagnoses and test results provided to the

5  NDOC by the outside-specialist are documented in the Patient's prison medical record, along with a

6  follow-up visit with a PRACTITIONER in which a discussion of the findings and plan is documented.

7  Additionally, DEFENDANTS shall make best efforts to ensure that any recommendations for further

8  testing, treatment or diagnostic services made by the specialist are forwarded to the NDOC and

9  documented in the Patient's prison medical record, if the Patient is still incarcerated.  If required,

10  recommendations shall be reviewed by the Utilization Review Panel for final determination of

11  treatment.   In cases where the Utilization Review Panel is required to approve or authorize the

12  recommendations made by such a specialist, and the panel so approves or authorizes such

13  recommendations, the specialist recommendations shall be carried out in the manner prescribed by the

14  specialist, unless a deviation or override is ordered by the PRACTITIONER at the facility.  Such a

15  deviation or override must be affirmatively medically justified and documented in the medical record of

16  the Patient.  The above-referenced NDOC HEALTH STAFF member designated to track off-site and

17  specialty care will work with other QUALIFIED HEALTH CARE PROFESSIONALS and other

18  necessary staff to ensure that either the consultation is scheduled or the ordered care is provided.

19       **J.**   **INFIRMARY CARE**:   Under   the   guidance   of   the   MONITOR,

20  DEFENDANTS/STATE OF NEVADA will ensure that ESP provides adequate infirmary care for

21  Patients requiring close medical monitoring and/or nursing assistance.   At a minimum,

22  DEFENDANTS/STATE OF NEVADA will ensure that all infirmary Patients must be within sight or

23  sound of nursing or QUALIFIED HEALTH CARE PROFESSIONALS at all times.  Physician and/or

24  mid-level practitioner rounds shall be conducted on a daily basis or as specified by the categories of

25  care being provided, and a RN or higher level medical provider shall be present at the infirmary each

26  day with a minimum of eight (8) hours of RN care and sixteen (16) hours of LPN care per day.

27  Custody staff will not provide any routine medical care or medical observation in the infirmary.

28  Patients admitted in the infirmary will not have to "kite" (submit a medical request form) for medical

care.

**K.**   **DISMISSAL OF THE LAWSUIT**:  Upon execution of this AGREEMENT, and after notice to all parties and Court approval of the AGREEMENT, the parties shall jointly move the Court to enter an Order dismissing the RIKER LITIGATION with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).

**L.**   **MONITORING AND COMPLIANCE**

**1.**   The parties have jointly selected a neutral medical MONITOR (the "MONITOR"), Dr. Ronald Shansky, to be paid for according to the MONITOR PAYMENT PLAN, herein defined, and to serve throughout the term of the AGREEMENT.  The MONITOR shall provide and report on his ongoing assessment of the DEFENDANTS'/STATE OF NEVADA'S SUBSTANTIAL COMPLIANCE, according to the reporting requirements contained in the PLAN.

**2.**   The MONITOR shall conduct his INSPECTIONS of the ESP facility and submit his REPORTS, according to the following schedule, unless otherwise agreed to by the parties in writing, subject to the other provisions contained herein.

**(a)**   The MONITOR shall conduct his First INSPECTION no later than three (3) months after the EFFECTIVE DATE of this AGREEMENT, with at least three (3) weeks' notice to counsel for the parties and the Warden of ESP.  The MONITOR shall submit a proposed draft of his First Report to the counsel for the parties no later than thirty (30) days after he completes his First INSPECTION.  Counsel for the parties shall have a fifteen (15)-day comment period after receiving the proposed draft of the First Report to lodge any objections, comments, or remarks to the MONITOR concerning the proposed draft of the First Report.  Thereafter, the MONITOR shall submit the final draft of his First Report to counsel for the parties no later than fifteen (15) days after the end of this comment period, and in any event no later than sixty (60) days after he completes this First INSPECTION.

**(b)**   The MONITOR shall conduct his Second INSPECTION no sooner than four (4) months, but no later than six (6) months after the MONITOR'S First INSPECTION, specified in the preceding paragraph, with at least three (3) weeks' notice to counsel for the parties and the Warden of ESP.  The MONITOR shall submit a proposed draft of his Second Report

to counsel for the parties no later than thirty (30) days after he completes his Second INSPECTION. Counsel for the parties shall have a fifteen (15)-day comment period after receiving the proposed draft of the Second Report to lodge any objections, comments, or remarks to the MONITOR concerning the proposed draft of the Second Report. Thereafter, the MONITOR shall submit the final draft of his Second Report to counsel for the parties no later than fifteen (15) days after the end of this comment period, and in any event no later than sixty (60) days after he completes this Second INSPECTION.

(c) The MONITOR shall conduct his Third INSPECTION no sooner than four (4) months, but no later than six (6) months after the MONITOR'S Second INSPECTION, specified in the preceding paragraph, with at least three (3) weeks' notice to counsel for the parties and the Warden of ESP. The MONITOR shall submit a proposed draft of his Third Report to counsel for the parties no later than thirty (30) days after he completes his Third INSPECTION. Counsel for the parties shall have a fifteen (15)-day comment period after receiving the proposed draft of the Third Report to lodge any objections, comments, or remarks to the MONITOR concerning the proposed draft of the Third Report. Thereafter, the MONITOR shall submit the final draft of his Third Report to counsel for the parties no later than fifteen (15) days after the end of this comment period, and in any event no later than sixty (60) days after he completes this Third INSPECTION.

(d) The MONITOR shall conduct his Fourth INSPECTION no sooner than four (4) months but no later than six (6) months after the MONITOR'S Third INSPECTION, specified in the preceding paragraph, with at least three (3) weeks' notice to counsel for the parties and the Warden of ESP. The MONITOR shall submit a proposed draft of his Fourth Report to counsel for the parties no later than thirty (30) days after he completes his Fourth INSPECTION. Counsel for the parties shall have a fifteen (15)-day comment period after receiving the proposed draft of the Fourth Report to lodge any objections, comments, or remarks to the MONITOR concerning the proposed draft of the Fourth Report. Thereafter, the MONITOR shall submit the final draft of his Fourth Report to counsel for the parties no later than fifteen (15) days after the end of this comment period, and in any event no later than sixty (60) days after he completes this Fourth INSPECTION.

3. The MONITOR shall have access to the ESP facility for on-site INSPECTIONS according to the schedule in the Plan. During the MONITOR's on-site INSPECTION,

he or she shall be able to observe all aspects of medical care at the facility, including but not limited to direct care of Patients, subject to the informed consent of the Patients.  The MONITOR will also have access to interviews with prisoners at ESP and their medical records.  The MONITOR will also have access to the death charts of all prisoners who died either at ESP or after transfer to a hospital or the Regional Medical Facility in Carson City, NV within the preceding year, where, upon being informed of such deaths, the MONITOR reasonably believes that provision of medical care at ESP, or the lack thereof, may have caused or contributed to such deaths.  The MONITOR will have access to members of the ESP medical staff, custody staff, and other relevant medical information or documents, as they may relate to the provision of medical care, subject to reasonable time-place-and-manner restrictions imposed by the Warden of ESP for security purposes.  Upon reasonable request by the MONITOR, DEFENDANTS/STATE OF NEVADA will provide copies of records to the MONITOR for off-site review, in which case, a copy of the same shall be provided to the parties.

    **4.**  In each report, the MONITOR shall evaluate the status of compliance for the following areas of medical care, as limited by the following provisions of the AGREEMENT: Medications (§ V(E)); Chronic Care (§ V(F)); Sick Call (§ V(G)); Intra-system Transfers and Assessments (§ V(H)); Scheduled Off-Site Services (§ V(I)); and Infirmary Care (§ V(J)).  For each of these enumerated provisions, the MONITOR shall indicate a finding of SUBSTANTIAL COMPLIANCE, Partial Compliance, or Non-Compliance.  In order to assess compliance, the MONITOR shall perform the following tasks, where applicable and necessary:  review a sufficient number of pertinent documents to accurately assess current conditions; interview all pertinent staff; and interview a sufficient number of prisoners to accurately assess current conditions.  The MONITOR shall utilize the monitoring tool, attached hereto as Appendix A, in his assessment of DEFENDANTS' compliance.  The MONITOR shall be responsible for independently verifying that DEFENDANTS/STATE OF NEVADA are making reasonable progress in achieving SUBSTANTIAL COMPLIANCE and thereafter maintaining such compliance, according to the PLAN.  Each MONITOR's report shall describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed and/or observed, and the factual basis for each of the MONITOR's findings.  Each of the MONITOR's reports shall include specific

1  recommendations for actions needed to bring the DEFENDANTS/STATE OF NEVADA into

2  SUBSTANTIAL COMPLIANCE with this AGREEMENT.  Counsel for both parties shall be entitled

3  to accompany the MONITOR on his site INSPECTIONS to ESP, in accordance with the terms of the

4  PLAN.  All parties are entitled to communicate ex parte with the MONITOR.  PLAINTIFFS' counsel

5  agree to limit communications with the MONITOR to no more than four (4) hours for each of the

6  INSPECTIONS required as part of this AGREEMENT.  Any communications exceeding the four (4)

7  hours allotted for each INSPECTION shall be at the expense of the PLAINTIFFS' counsel.

8      5.      The Parties' counsel may accompany the MONITOR during his/her tour

9  of the ESP facilities, during regularly-scheduled MONITOR site INSPECTIONS, subject to reasonable

10  time-place-and-manner restrictions imposed by the Warden of ESP for security purposes.

11      6.      During such site INSPECTIONS, counsel for either party may

12  accompany the MONITOR during any phase of his INSPECTION, including any discussions the

13  MONITOR may have with staff or inmates at ESP, and including any document review the MONITOR

14  may perform.  In this regard, the MONITOR has discretion to communicate with staff or inmates,

15  subject to reasonable time-place-and-manner restrictions imposed by the Warden of ESP for security

16  purposes.  The MONITOR may conduct confidential interviews with prisoners outside the presence of

17  counsel for either party, but if information from such an interview is used as evidence in the

18  MONITOR'S report, the source of the information must be identified.  All visits to ESP shall be limited

19  to those visits regularly scheduled by the MONITOR, according to the PLAN.

20      7.      Should the appointed MONITOR have to step down from his/her position

21  prior to the complete performance of the PLAN as provided for herein, the parties will select a new

22  MONITOR according to the process set forth herein.

23      8.      The monitoring period will begin on the EFFECTIVE DATE of this

24  AGREEMENT, and last for two years, unless extended pursuant to the terms of this AGREEMENT.

25  The MONITOR will, for the duration of his monitoring, submit his reports to counsel for the parties in

26  compliance with the PLAN.  Any of the MONITOR'S reports disseminated beyond counsel for the

27  parties in this action shall be subject to the same confidentiality provisions set forth in the *Stipulation*

28  *Regarding Access to and Confidentiality of Medical Records* filed in the RIKER LITIGATION, Docket

No. 54.

## M.   DISPUTE RESOLUTION CONCERNING THE PLAN

**1.**   **SCOPE**:  The parties agree to limit the scope of their disputes concerning the execution of the PLAN to only three (3) topical areas, and none other: (a) disputes concerning DEFENDANTS' compliance with the PLAN, as limited herein; (b) disputes concerning access issues at ESP during scheduled MONITOR INSPECTIONS, which also includes access to any documents the MONITOR requests before or after an INSPECTION; and (c) disputes concerning the performance of the MONITOR.

## 2.   DISPUTES CONCERNING COMPLIANCE

**(a)**   **Prerequisites For Commencing Dispute**:  Before PLAINTIFFS' counsel may commence any dispute concerning DEFENDANTS' compliance with the PLAN, one of the following pre-requisites must first occur:

**(1)**   The MONITOR must issue at least one report, excluding the First Report, concluding that DEFENDANTS/STATE OF NEVADA are in non-compliance with any of the following provisions of the AGREEMENT: Medications (§ V(E)); Chronic Care (§ V(F)); Sick Call (§ V(G)); Intra-system Transfers and Assessments (§ V(H)); Scheduled Off-site Services (§ V(I)); and Infirmary Care (§ V(J)), inspected or observed by the MONITOR at the corresponding Site INSPECTION; or

**(2)**   The MONITOR must issue two consecutive reports, concluding that DEFENDANTS/STATE OF NEVADA are in partial compliance with the same particular provisions of the AGREEMENT (Medications (§ V(E)); Chronic Care (§ V(F)); Sick Call (§ V(G)); Intra-system Transfers and Assessments (§ V(H)); Scheduled Off-site Services (§ V(I)); and Infirmary Care (§ V(J))) that were inspected or observed by the MONITOR during the MONITOR's Site INSPECTIONS.

**(b)**   **Remedy for Dispute**:  If the dispute concerns DEFENDANTS' compliance with the PLAN, as herein provided, the following procedures and remedies shall govern such disputes:

/ / /

**(1)** __Disputes Arising Before the Issuance of the Fourth__ __Report__: If the dispute arises before the Issuance of the final draft of the Fourth Report, such disputes shall be limited to disputes asserting that DEFENDANTS cannot obtain SUBSTANTIAL COMPLIANCE with a particular component(s) or aspect(s) of the PLAN by the time of the Fourth INSPECTION.  Hence, the sole remedy for such a dispute shall be limited to the remedy of extending the monitoring period or effective period of the AGREEMENT until such time, but no longer than necessary, as DEFENDANTS require to attain SUBSTANTIAL COMPLIANCE with the particular component(s) or aspect(s) of the PLAN in question.  The parties do not intend to make this remedy an acceleration clause, as the parties envision that DEFENDANTS may have as late as until the Fourth INSPECTION to obtain SUBSTANTIAL COMPLIANCE with any particular provision(s) of the PLAN.

**(2)** __Disputes Arising After the Issuance of the Fourth__ __Report__: If the dispute arises after the Issuance of the final draft of the Fourth Report, the sole remedy for such a dispute shall be limited to the remedy of extending the monitoring period or EFFECTIVE PERIOD of the AGREEMENT until such time, but no longer than necessary, as DEFENDANTS require to attain SUBSTANTIAL COMPLIANCE with the particular component(s) or aspect(s) of the PLAN in question.   All components or aspects of the PLAN for which SUBSTANTIAL COMPLIANCE is achieved by DEFENDANTS on the Fourth INSPECTION, shall be removed or drop off the MONITOR's checklist of remaining components or aspects that require subsequent SUBSTANTIAL COMPLIANCE.

**(c)** __Early Dispute-Resolution Procedure__: In the event that a dispute arises concerning DEFENDANTS' compliance with the PLAN, PLAINTIFFS' counsel shall notify DEFENDANTS' counsel in writing of the facts supporting such a claim.  In response, DEFENDANTS' counsel shall then notify PLAINTIFFS' counsel in writing within fifteen (15) days that: (a) the alleged problems have been remedied or (b) that the DEFENDANTS' counsel disagrees with the PLAINTIFFS' counsel's description of the problem.   The facts supporting the DEFENDANTS' counsel's conclusion shall be included in such notice. If the PLAINTIFFS wish to proceed further with the dispute, upon receipt of DEFENDANTS' response, the PLAINTIFFS' counsel shall request a

1    meeting with DEFENDANTS' counsel to discuss and attempt to resolve the problem(s) identified in

2    their written notice.  Counsel for both parties shall attend the meeting either in-person or via telephone.

3           **(d)**    **Mediation**: If, after fifteen (15) days following any meeting held

4    pursuant to the preceding paragraph, or fifteen (15) days after receiving DEFENDANTS' counsel's

5    written response, the dispute has not been resolved among the parties, PLAINTIFFS' counsel may

6    request a mediation conference with a suitable mediator agreed to by both parties in writing.  The

7    parties agree to participate in good faith in any such mediation requested under the terms set forth in

8    this section of the AGREEMENT.  At either party's discretion, the MONITOR shall serve as an expert

9    witness to aid the Mediator in his or her fact-finding, and the MONITOR shall offer his or her opinion

10    related to the dispute.  PLAINTIFFS' counsel may request that the mediator make a recommendation

11    that the monitoring period or effective period of the AGREEMENT be extended until such time, but no

12    longer than necessary, for DEFENDANTS to attain SUBSTANTIAL COMPLIANCE with the

13    particular provision(s) of the PLAN in question, as determined by the MONITOR in a subsequent

14    INSPECTION.  The mediator shall only make a recommendation to extend this AGREEMENT if there

15    is clear and convincing evidence, as established by the PLAINTIFFS, that DEFENDANTS will not

16    achieve/have not achieved SUBSTANTIAL COMPLIANCE with the particular provision(s) of the

17    AGREEMENT (Medications (§ V(E)); Chronic Care (§ V(F)); Sick Call (§ V(G)); Intra-system

18    Transfers and Assessments (§ V(H)); Scheduled Off-site Services (§ V(I)); and Infirmary Care (§ V(J)).

19    Should the mediator recommend that the monitoring period or effective period of the AGREEMENT be

20    extended until DEFENDANTS can obtain SUBSTANTIAL COMPLIANCE with the relevant

21    provision(s) of the AGREEMENT, the parties agree to be bound by that recommendation.  If an

22    extension of the AGREEMENT is recommended by the mediator, DEFENDANTS agree to pay all of

23    the fees and costs of the MONITOR, for all additional site INSPECTIONS and reports required in order

24    for DEFENDANTS to achieve SUBSTANTIAL COMPLIANCE with such provision(s) of the

25    AGREEMENT, as determined by the MONITOR.  If a party calls the MONITOR as a witness for

26    mediation, that party shall pay the costs and fees of the MONITOR unless both parties agree otherwise

27    in writing.

28    / / /

3.    **DISPUTES CONCERNING ACCESS**

**(a)   Scope**:   The parties agree to limit their disputes concerning adequate access to conduct INSPECTIONS under the terms of this AGREEMENT for either the MONITOR and/or counsel for either party, to disputes concerning access to INSPECTION sites that the MONITOR wishes to inspect at ESP, persons whom the MONITOR wishes to observe or interview at ESP, or records the MONITOR wishes to review.

**(b)   Remedy for Dispute**:   The remedy for any access-issue dispute shall be the remedial provision of access, commensurate with the access denied.

**(c)   Early Dispute-Resolution Procedure**:   If the dispute concerns access issues at the site during a regularly-scheduled INSPECTION by the MONITOR, counsel for the complaining party shall immediately notify counsel for the opposing party.  If reasonably practicable, such notice shall be given contemporaneously at the time access is denied.  However, if it is not reasonably practicable to give such contemporaneous notice, or if such notice was given, but the matter was not sufficiently resolved at that time, then counsel for the complaining party shall notify counsel for the opposing party in writing of the facts supporting such a claim within fifteen (15) days of the denial of access.  counsel for the opposing party shall then notify counsel for the complaining party in writing within fifteen (15) days that: (a) the alleged problems have been remedied or (b) that the counsel for the opposing party disagrees with the counsel for the complaining party's description of the problem.  The facts supporting the conclusion of the counsel for the opposing party shall be included in such notice.  If counsel for the complaining party wishes to pursue this dispute, then the counsel for the complaining party shall request a meeting with counsel for the opposing party, upon receipt of the opposing party's response, to discuss and attempt to resolve the problem(s) identified in their written notice.  Counsel for both parties shall attend the meeting either in-person or via telephone.

**(d)   Mediation**: If, after fifteen (15) days following any meeting held pursuant to the preceding paragraph, or fifteen (15) days after receiving opposing counsel's response, the dispute has not been resolved among the parties, counsel for the complaining party may request a mediation conference with a suitable mediator agreed to by both parties in writing.  The parties agree to participate in good faith in any such mediation requested under the terms set forth in this section of the

AGREEMENT.  At either party's discretion, the MONITOR shall serve as an expert witness, to aid the Mediator in his or her fact-finding, and the MONITOR shall offer his or her opinion concerning the access issue.  In such a dispute, the complaining party must prove by clear and convincing evidence that the complaining party was entitled to such access, in accordance with the PLAN, and that the opposing party or its counsel, clients, or representatives denied such access.  Should the mediator recommend that such access be granted, then the parties agree to be bound by that recommendation.  If a party calls the MONITOR as a witness for mediation, that party shall pay the costs and fees of the MONITOR unless both parties agree otherwise in writing.

### 4.   **DISPUTES CONCERNING THE MONITOR**

(a)   **Scope**:  The parties agree to limit their disputes concerning the performance of the MONITOR to allegations that the MONITOR has failed to support either the methodology or findings set forth in any final draft Report with competent evidence.

(b)   **Remedy for Dispute**:  If the dispute concerns the performance of the MONITOR, then the sole remedy shall be limited to the replacement of the MONITOR, as set forth herein.

(c)   **Early Dispute-Resolution Procedure**:  If the dispute concerns the performance of the MONITOR, counsel for the complaining party shall notify counsel for the opposing party in writing of the facts supporting such a claim.  Counsel for the opposing party shall then notify counsel for the complaining party in writing within fifteen (15) days that: (a) the alleged problems have been remedied or (b) that the counsel for the opposing party disagrees with the counsel for the complaining party's description of the problem.  The facts supporting the counsel for the opposing party's conclusion shall be included in such notice.  If the complaining party wishes to pursue the dispute, then the counsel for the complaining party shall request a meeting with counsel for the opposing party, upon receipt of the opposing party's response, to discuss and attempt to resolve the problem(s) identified in their written notice.  Counsel for both parties shall attend the meeting either in-person or via telephone.

(d)   **Mediation**: If, after fifteen (15) days following any meeting held pursuant to the preceding paragraph, or fifteen (15) days after receiving opposing counsel's response,

1  the dispute has not been resolved among the parties, counsel for the complaining party may request a

2  mediation conference with a suitable mediator agreed to by both parties in writing.  The parties agree to

3  participate in good faith in any such mediation requested under the terms set forth in this section of the

4  AGREEMENT.  At either party's discretion, the MONITOR shall be available to answer questions

5  concerning his performance as the MONITOR.  In such a dispute, the complaining party must prove by

6  clear and convincing evidence that the MONITOR has failed to support either the methodology or

7  findings set forth in any final draft Report with competent evidence.  Should the mediator recommend

8  that the MONITOR be replaced, such a replacement shall be made in accordance with the provisions set

9  forth herein, and the parties agree to be bound by that recommendation.  If a party calls the MONITOR

10  as a witness for mediation, that party shall pay the costs and fees of the MONITOR unless both parties

11  agree otherwise in writing.

12       **N.**     **MONITOR PAYMENT PLAN**:  DEFENDANTS/STATE OF NEVADA shall

13  bear the fees and costs of the MONITOR appointed in this matter with the exception of the fees set

14  forth in Section V(L)(4) and any fees and costs of the MONITOR incurred by the PLAINTIFFS during

15  mediation as set forth in Section V(M) of this AGREEMENT.

16       **O.**     **METHODS FOR REPLACING THE MONITOR**:   Should the appointed

17  MONITOR have to step down from his position prior to the end of the EFFECTIVE PERIOD of the

18  AGREEMENT, the parties will select a new MONITOR, who will be chosen from the following list of

19  candidates, not necessarily in order of preference, based on the availability of the candidates to perform

20  the MONITOR'S role in the timeframe set forth in this AGREEMENT:  Dr. Michael Puisis; Dr. Joe

21  Goldenson; or Dr. Marc Stern.  If all these three persons are unavailable to be appointed MONITOR,

22  the replacement MONITOR shall be selected by the parties jointly.

23  **VI.**     **EXPIRATION OF AGREEMENT**:  This AGREEMENT shall automatically expire

24  two years after the EFFECTIVE DATE unless: (1) a mediator recommends that the AGREEMENT be

25  extended, as provided for and limited herein; and/or (2) the parties are engaged in dispute resolution

26  pursuant to Section V(M) of this AGREEMENT.  If the MONITOR's final Fourth Report indicates that

27  DEFENDANTS/STATE OF NEVADA have achieved SUBSTANTIAL COMPLIANCE with any

28  provision(s) of the PLAN, those particular provision(s) of the PLAN shall expire and not be subject to

further performance and/or dispute, whether by mediation or otherwise.

**VII.**    **OTHER TERMS AND PROVISIONS**

**A.**    **WARRANTY OF CAPACITY TO EXECUTE AGREEMENT**:    The signatories to this AGREEMENT represent and warrant that no other person or entity has or had any interest in the claims, demands, obligations or causes of action referred to in this AGREEMENT and that they have the sole right and exclusive authority to execute this AGREEMENT and that they have not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations, or causes of action referred to in this AGREEMENT.  The parties further represent that the persons signing this AGREEMENT are fully authorized to do so on behalf of each party, respectively.

**B.**    **BINDING EFFECT UPON SUCCESSORS IN INTEREST**:    This AGREEMENT shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

**C.**    **REPRESENTATION OF COMPREHENSION OF DOCUMENT**:    In entering into this AGREEMENT, the parties acknowledge and represent that they have relied upon the legal advice of their attorneys, and that the terms of this AGREEMENT have been completely read and explained to them by their attorneys, and that those terms are fully understood and voluntarily accepted by them.

**D.**    **GOOD FAITH SETTLEMENT**:  This AGREEMENT is entered into in good faith, in accordance with Federal Rule of Civil Procedure 23(e), and the parties will use their best efforts and good faith to jointly petition the Court to further the settlement, compromise, and voluntary dismissal with prejudice of the RIKER LITIGATION.

**E.**    **CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT OF THIS AGREEMENT**:    This AGREEMENT shall be construed, interpreted, and enforced in accordance with the laws, rules of procedure, and/or common law of the State of Nevada.

**F.**    **ADDITIONAL DOCUMENTS**:  Each party agrees to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the basic terms and intent of this AGREEMENT.

**G.**    **EFFECTIVENESS**:  This written AGREEMENT shall become effective when

1  signed by the legal representatives of the parties, approved by the court after notice to class members,

2  and after dismissal of the RIKER LITIGATION with prejudice.

3        **H.**    **COMPLETENESS OF DOCUMENT**: This AGREEMENT contains the entire

4  understanding between the parties with respect to the matters set forth herein, and there are no

5  representations, warranties, agreements, arrangements, or undertakings, oral or written, between or

6  among the parties hereto relating to the subject matter of this AGREEMENT which are not fully

7  expressed herein.

8        **I.**    **COUNTERPARTS AND FACSIMILE COPIES**:  This AGREEMENT may

9  be executed in counterparts.  The parties agree that photocopies of this AGREEMENT, as well as

10  facsimile signatures, shall be presumed to be authentic, valid, and binding, subject to challenges and

11  proof to the contrary.

12        **J.**    **SEVERABILITY**:  The parties agree that, in the event that any portion

13  ("Offending Portion(s)") of this AGREEMENT is declared by a court of competent jurisdiction to be

14  invalid or unenforceable for any reason whatsoever, then those Offending Portions shall be severed

15  from this AGREEMENT, as if they were never incorporated into this AGREEMENT.  The parties

16  further agree that if any Offending Portions are so severed from this AGREEMENT, then the remainder

17  of the AGREEMENT shall, nevertheless, survive and remain fully intact, valid, and enforceable.

18  **VIII.**   **FEES AND COSTS**

19        **A.**    Counsel for DEFENDANTS will recommend to the Nevada Board of Examiners

20  (BOE) that DEFENDANTS receive necessary authorization and state funding to pay a one-time, fixed,

21  lump-sum payment of PLAINTIFFS' fees and costs (including attorneys' fees) to PLAINTIFFS'

22  counsel, in the amount of Three Hundred and Twenty-Five Thousand Dollars ($325,000.00).

23        **B.**    If the BOE grants such authorization and funding, DEFENDANTS will pay such

24  fees and costs in that full amount to PLAINTIFFS' counsel, who agrees to apply such funds to

25  PLAINTIFFS' fees and costs incurred in the RIKER LITIGATION.

26        **C.**    DEFENDANTS' payment of this one-time, fixed, lump-sum payment to

27  PLAINTIFFS' counsel, in an amount never to exceed Three Hundred and Twenty-Five Thousand

28  Dollars ($325,000.00), will constitute the complete and total payment to resolve this litigation, and no

1  other monetary consideration, whether for fees or costs, shall be paid by DEFENDANTS/STATE OF

2  NEVADA to PLAINTIFFS, except as expressly provided for herein.

3     **D.**  Except for the payment of fees and costs as provided for and limited herein,

4  consisting of consideration paid by DEFENDANTS to PLAINTIFFS' counsel and the payment of the

5  MONITOR's fees and costs by the parties, the parties shall bear their own fees and costs incurred in

6  any way and for any and all activity arising from and relating to this AGREEMENT, including but not

7  limited to all costs incurred by the parties or their agents, successors, representatives, or attorneys in the

8  participation and attendance in the monitoring process, any breach of contract action and any and all

9  efforts to enforce, clarify, and interpret this AGREEMENT, regardless of when such efforts are made.

10    **IX.**  **COURT APPROVAL AND NOTICE OF THE SETTLEMENT**

11     **A.**  The Parties acknowledge that Rule 23(e) of the Federal Rules of Civil Procedure

12  requires that the Court must direct notice to the class and approve this AGREEMENT. Therefore, upon

13  signature of this AGREEMENT, the parties shall seek approval from the Court pursuant to Fed. R. Civ.

14  P. 23(e).

15     **B.**  DEFENDANTS/STATE OF NEVADA shall ensure that notice, as defined and

16  ordered by the Court, is provided to the class, including all prisoners currently incarcerated and all new,

17  incoming prisoners, whether confined in general population, segregation/protective custody, or the

18  infirmary, according to the time schedule herein specified. ESP prisoners will be provided a copy of

19  such notice in English and Spanish, as follows:  Such notice shall be posted in each housing unit, the

20  law library, the infirmary, and the common recreation areas.  Additionally, such notice shall be

21  provided to prisoners who are housed in segregation/protective custody at the time of initial notice

22  distribution by distributing such notice to each segregation/protective custody prisoner.  Such notice

23  shall also be distributed to prisoners who are housed in the infirmary at the time of initial notice

24  distribution by distributing such notice to each prisoner in the infirmary.

25     **C.**  Such notice shall be posted and/or provided to each ESP prisoner currently

26  confined at ESP, as stated above, no later than ten (10) days following the Court's approval of the form

27  and manner of such notice. Thereafter, all new, incoming ESP prisoners shall receive such notice upon

28  entry into ESP, along with their orientation packets.  Such notice shall remain posted through the date

1   that class member objections to the AGREEMENT are due by order of the Court.

2        **D.**    DEFENDANTS/STATE OF NEVADA shall provide a copy of or explain the

3   terms of this AGREEMENT to all their agents, representatives, and employees in any way connected

4   with medical care of class members, in order to ensure their understanding of the scope and substance

5   of this AGREEMENT.

6        **E.**    This AGREEMENT shall be submitted for Court approval after the BOE

7   approves the fees and costs set forth in Section VIII of this AGREEMENT, and all duties and

8   obligations under this AGREEMENT are contingent upon such final approval by the Court.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

Dated: June 21, 2010

Stephen D. Quinn
Chief Deputy Attorney General
NEVADA ATTORNEY GENERAL
100 North Carson Street
Carson City, NV 89701-4717
Phone: (775) 684-1222
Fax: (775) 684-1275
Email: squinn@ag.nv.gov

Counsel for DEFENDANTS/STATE OF NEVADA

Dated: June 29, 2010

Michon A. Martin
Deputy Attorney General
NV Bar No. 11336
NEVADA ATTORNEY GENERAL
100 North Carson Street
Carson City, NV 89701-4717
Phone: (775) 684-1261
Fax: (775) 684-1275
Email: MMartin@ag.nv.gov

Counsel for DEFENDANTS/STATE OF NEVADA

Dated: June 29, 2010

William J. Geddes
NV Bar No. 6984
Senior Deputy Attorney General
NEVADA ATTORNEY GENERAL
100 North Carson Street
Carson City, NV 89701-4717
Phone: (775) 684-1256
Fax: (775) 684-1275
Email: WGeddes@ag.nv.gov
Counsel for DEFENDANTS/STATE OF NEVADA

Dated: July 9, 2010

Amy Fettig
Margaret Winter
THE NATIONAL PRISON PROJECT
OF THE ACLU FOUNDATION, INC.
915 15th Street, N.W., Seventh Floor
Washington, D.C. 20005
Tel. (202) 393-4930; fax (202) 393-4931
mwinter@npp-aclu.org
afettig@npp-aclu.org

Lee Rowland
ACLU OF NEVADA
NV Bar No. 10209
1325 Airmotive Way, Suite 202
Reno, NV 89502
Tel: (775) 786-1033
Fax: (775) 786-0805
rowland@aclunv.org

Allen Lichtenstein
NV Bar No. 3992
Maggie McLetchie
NV Bar No. 10931
ACLU OF NEVADA
732 Sixth Street, Suite 200A
Las Vegas, Nevada 89101
Tel (702) 366-1902
Fax (702) 366-1331
alichtensteinlaw@aol.com
mcletchie@aclunv.org

Stephen F. Hanlon
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel. (202) 955-3000
Fax (202) 955-5564

Counsel for PLAINTIFFS/ESP INMATES

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

# **APPENDIX A**

# APPENDIX A

## MONITORING TOOL TO BE USED WHEN MONITORING THE NEVADA SETTLEMENT AGREEMENT

## Medications

In the area of medications we will monitor the following:

1. The timeliness of patient receipt of medications from the date of order. The expectation is that patient receipt should occur within one day of the order during normal weekdays. This should be achieved either through direct receipt from the NDOC pharmacy or from use of stock medications. We expect there will be some exceptions. As part of number one we will select a sample of medication orders, a minimum of 20, and review the timeliness of receipt.
2. We will observe medication administration by nursing staff, identifying proper procedures, including verification of patients' identification, observing for ingestion and timely documentation of the administration. Stock medicine supplies will be evaluated and processes for ensuring adequate stock supplies will be reviewed.
3. We will review for medication continuity connected to intrasystem transfers. For Keep on Person medications we will observe the process at the time inmates enter ESP and for nurse administered medications we will compare the time of entry to documentation of the date and time of administration.
4. We will review medication administration records both for a calculation of missed documentation and for whether, when there are three consecutive refusals, there is a referral to a clinician. For the missed documentation, we will calculate the total number of doses expected on the medication administration record and compare that with the total number of blank spaces on the record. The rate should be under 1%. Finally, we will review the process for inmates signing for receipt of their medication refills and evaluate the timeliness of "Keep on Person" (KOP) orders and refills.
5. The monitor may look at other documentation that he believes is pertinent to his analysis regarding Medications.

## Chronic Care

We will review a sample of five records of patients in each of the following areas:  hypertension, diabetes, asthma, seizure disorder, HIV disease or on anticoagulation, and in chronic pain clinic. In this review we will determine:

1. Whether the care is consistent with the NDOC clinical guidelines (as approved by the Monitor).
2. Whether when the disease is not in good control, the clinical response was appropriate.
3. We will review whether there is an initial chronic care visit in which an adequate disease specific history is generated in order to develop an adequate plan of care.
4. We will review the management of chronic pain and determine whether it is consistent with the NDOC guidelines (as approved by the Monitor).
5. The monitor may look at other documentation that he believes is pertinent to his analysis regarding Chronic Care.

**APPENDIX A-1**

## Sick Call

We will review 10 records from the sick call area to determine:

1. Is there sick call pick up of slips daily and who is picking up the slips (e.g., by checking the unit log book to ensure that rounds were made).
2. Does sick call triage occur within 24 hours.
3. Is there a face to face assessment within 48 hours of the triage.
4. We will attempt to determine whether patients presenting with the same complaint on two consecutive requests are in fact referred to an advanced level provider.
5. Is the sick call assessment performed by an RN or advanced level provider.
6. Are urgent requests responded to timely.
7. Are staff vacancies and staffing levels impinging on the functioning of sick call or other aspects of the Monitor's review?
8. The monitor may look at other documentation that he believes is pertinent to his analysis regarding Sick Call.

## Intrasystem Transfers

We will review at least 20 records of patients who have recently entered the facility and whose records are selected because we know they have identified chronic problems and are on medications.

1. We will review whether the transfer screening occurs within 24 hours.
2. We will review whether the screening takes place in a confidential space.
3. We will determine whether there is documentation of all relevant aspects of the form in comparison to what we find in the record such that continuity is assured.
4. We will observe the process to determine whether appropriate instructions are provided to the patients regarding procedures to access services.
5. The monitor may look at other documentation that he believes is pertinent to his analysis regarding Intrasystem Transfers.

## Scheduled Offsite Services

We will review both specialty consultations and diagnostic procedures, 10 records of each.

1. We will see whether, from the time of order, services can be scheduled timely based on the clinician's request.
2. We will determine whether the consultation and/or procedure reports are received timely.
3. We will review whether there is a timely follow up visit with the clinician in which there is a documentation of discussion of findings and plan.
4. We will determine whether consultation recommendations are appropriately followed up, either by following through on what the consultant recommended or by explaining an alternative strategy.
5. The monitor may look at other documentation that he believes is pertinent to his analysis regarding Schedule Offsite Services.

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

**APPENDIX A-2**

Infirmary Care

We will review:

1. Whether staffing results in a healthcare professional within sight or sound of infirmary patients.
2. We will review whether patients are seen, according to policy, in a manner consistent with their acuity level.
3. We will review the consistency of the staffing with regard to the settlement agreement.
4. We will review the adequacy of the advanced level provider (including physicians) and nursing assessments with regard to initial assessments, ongoing rounds and discharge notes and plans. We will review records both of patients in the infirmary as well as discharges from the infirmary, five records of each. We will review mortality records and sentinel events records to evaluate the functioning of the infirmary and other aspects of medical care pertinent to the Monitor's review.
5. The monitor may look at other documentation that he believes is pertinent to his analysis regarding Infirmary Care.

**APPENDIX A-3**